UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

TINA LOUISE THEIS,                )       CASE NO. 3:17CV1866
                                  )
        Plaintiff,                )
                                  )       JUDGE JEFFREY J. HELMICK
        v.                        )       Magistrate Judge George J. Limbert
                                  )
NANCY A. BERRYHILL[1],             )
ACTING COMMISSIONER OF SOCIAL     )       REPORT AND RECOMMENDATION
SECURITY ADMINISTRATION,          )       OF MAGISTRATE JUDGE
                                  )
        Defendant.                )

        Plaintiff Tina Louise Theis ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. In her brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred: (1) by finding that several of her physical and mental health impairments were not severe; (2) by failing to properly evaluate the opinions concerning her psychological conditions and limitations; (3) by not specifically considering the side effects of her medications; and (4) by failing to find that she was unable to sustain competitive work because the vocational expert ("VE") testified that employers would not tolerate an employee being off-task more than 15% of the workday and absent from work more than 1 day per month. ECF Dkt. #13. For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's case in its entirety WITH PREJUDICE.

## I.    FACTUAL AND PROCEDURAL HISTORY

        Plaintiff filed an application for SSI on July 11, 2014, alleging disability beginning October 31, 2008, but she amended her onset date by motion to July 11, 2014. ECF Dkt. #11 ("Tr.") at 182, 208.[2] Plaintiff alleged disability due to depression, anxiety, migraines and all over pain from

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to

depression and anxiety.  *Id*. at 213.  The Social Security Administration ("SSA") denied her application initially and upon reconsideration.  *Id.* at 77-122.  Plaintiff requested a hearing before an ALJ, which was held on March 10, 2016. *Id*. at 41, 123.

On May 4, 2016, the ALJ issued a decision denying Plaintiff's application for SSI.  Tr. at 20-34.  On September 6, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  She filed a brief on the merits on December 20, 2017 and Defendant filed her merits brief on January 19, 2018.  ECF Dkt. #s 13, 14.

## II.  RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.  Relevant Medical Evidence

As Plaintiff points out, she sustained a work injury to her right hand in 2000 and underwent multiple surgeries.  ECF Dkt. #13 at 9; Tr. at 299-313.

On July 26, 2007, Plaintiff presented to the emergency room complaining that on two occasions that morning, her heart started racing and she had chest pressure and shortness of breath. Tr. at 330.  She blamed anxiety or allergies.  *Id*.  She was diagnosed with presyncope with possible dysrhythmia and admitted to the hospital for further evaluation and treatment.  *Id*. at 331.  No significant abnormalities were discovered upon examination and further evaluation.  *Id*. at 331-349. She was discharged to home on July 27, 2007 with instructions as to activity and diet, referred to a family practice physician, and a 24-hour Holter monitor was ordered.  *Id.* at 340.

On July 28, 2007, Plaintiff presented to the emergency room complaining of being dizzy and light-headed.  Tr. at 314.  She explained that she started on Chantix and Metoprolol the week prior and after taking these medications, she became very dizzy and light-headed and felt like she was going to pass out.  *Id*.  She also complained of chest pressure and her arms started tingling.  *Id*.  The symptoms had completely resolved while she was in the emergency room.  *Id*.  She thought it was medication-related.  *Id.*  Plaintiff's recent admission was noted and her negative cardiac workup at that time.  *Id.*  Cardiac enzymes were run again and were negative.  *Id*. at 316.  The doctor referred

---

easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

Plaintiff to a family physician for follow up and told her to do no strenuous activity, continue taking an aspirin each day, and follow up for evaluation and a probable stress test.  *Id.*

Notes from Plaintiff's primary care physician, Dr. Halachanova, dated April 17, 2012, indicate that Plaintiff presented indicating that she was too busy and had no money to come to the doctor.  Tr. at 382.  She reported that she was doing "OK" with her anxiety on the medication prescribed, but she had a lot going on in her life.  *Id.*  She was diagnosed with anxiety and allergies, and her medications were continued.  *Id.*

On October 4, 2012, Plaintiff presented to the emergency room complaining of vomiting and a worsening headache that awakened her.  Tr. at 368.  She indicated that she no longer had a primary care doctor because of money issues.  *Id.*  She stated that she started a new job three weeks prior and did a lot of lifting and wondered if that brought on the headaches.  *Id.*  Upon examination, Plaintiff was photophobic, her pupils were equal, round and reactive to light, with no abnormalities, and no focal, motor or sensory deficits were noted.  *Id.*  She was given a shot of Toradol and Phenergan, and diagnosed with cephalgia.  *Id.*  She was referred to a doctor.  *Id.*

On March 13, 2014, Plaintiff presented to the emergency room complaining of constant chest pain and dyspepsia that started the night before.  Tr. at 428-436.  An EKG and chest x-rays showed normal results.  *Id.* at 429.  She was treated with a gastrointestinal cocktail and her symptoms improved.  *Id.*  The doctor believed that Plaintiff's symptoms were more gastrointestinal-related rather than cardiac.  *Id.*  She was prescribed Prilosec and given a prescription for Celexa because she was out of her medication.  *Id.*  She was diagnosed with chest pain likely secondary to dyspepsia, gastroesophageal reflux disease, anxiety, and elevated blood pressure.  *Id.*

Plaintiff presented to an urgent care facility on April 28, 2014 indicating that she needed a doctor referral because she had been going to a free clinic for several months and just finished her last Celexa prescription.  Tr. at 427.  She explained that she had been off of Celexa for the last two weeks and started to feel more anxious.  *Id.*  Plaintiff underwent a physical examination and was written prescriptions for Celexa, Loratadine and Omeprazole.  *Id.*

Treatment notes from the Defiance Cares Free Clinic ("Clinic") dated June 21, 2014 indicate that Plaintiff presented stating that she was taking Celexa and Loratadine and was doing well, but

-3-

she was currently off of her medications because she lacked insurance.  Tr. at 410.  She was examined and diagnosed with allergic rhinitis and depression/anxiety.  *Id.*  Blood tests were ordered and she was prescribed Celexa and Loraditine.  *Id.*

Clinic treatment notes dated July 19, 2014 show that Plaintiff presented complaining that her medications needed changed because her depression and anxiety were worsening.  Tr. at 405.  She stated that she had difficulty leaving her house due to her anxiety.  *Id.*  She was diagnosed with anxiety and elevated blood sugar and her Celexa was increased.  *Id.*  A history of anxiety disorder and panic attacks was noted.  *Id.*

On July 28, 2014, Plaintiff presented to the Defiance Community Health Center in order to establish care.  Tr. at 448.  She indicated that the Clinic had recommended that she follow up for therapy regarding her depression and anxiety and then she decided to come to this Center for medical care as well.  *Id.*  Plaintiff reported to Certified Nurse Practitioner ("CNP") Askins that she had been taking Celexa on and off and just restarted it, but did not think that it was working.  *Id.* She reported a heaviness in her chest and difficulty breathing when she left the house.  *Id.*  She indicated that she rarely left the house except to go to work and to run errands.  *Id.*

Upon examination, CNP Askins observed that Plaintiff was obese but had normal physical examination in all areas, including normal right upper extremity strength, tone, and muscle bulk.  Tr. at 450.  Psychiatric examination indicated that Plaintiff's judgment and insight were intact, her mood was depressed, and her affect was appropriate.  *Id.* She was diagnosed with generalized anxiety disorder ("GAD"), recurrent major depression, and allergic rhinitis.  *Id.* at 451.  CNP Askins ordered blood tests and added Hydroxyzine to Plaintiff's Celexa.  *Id.*

Plaintiff returned to CNP Askins on August 18, 2014 and had no complaints.  Tr. at 453.  She reported that the Celexa was helping as her symptoms had improved, but she never took the Hydroxyzine.  *Id.*  Her physical examination was normal and a mental examination showed that she had intact insight, normal judgment, normal thought processes, normal mood, appropriate affect, intact memory, immediate recall and long-term recall, and normal attention and concentration.  *Id.* at 456.  She was diagnosed with GAD and her Hydroxyzine prescription was refilled.  *Id.*

-4-

CNP Askins' treatment notes dated September 8, 2014 show that Plaintiff presented for follow up of her anxiety and she reported that she had been really depressed or really anxious for the prior two weeks. Tr. at 458. She had a depressed mood, and indicated that she had a formal plan for committing suicide by taking an overdose of medication. *Id.* Plaintiff also reported some confusion and short-term memory problems. *Id.* Her physical examination was normal, and her psychiatric examination showed intact memory, normal judgment, intact insight, a depressed mood, and an appropriate affect. *Id.* at 460. CNP Askins diagnosed recurrent major depression and GAD. *Id.* She prescribed Zoloft and discontinued Celexa. *Id.*

On October 6, 2014, Plaintiff was admitted to the Crisis Unit at First Call for Help, Inc. in order to help get her medications stabilized. Tr. at 467. She reported to the licensed social worker ("LSW") her mood swings, panic attacks when she went out of the house and while in the house, increased crying, instability, increased appetite, and sleep and energy fluctuations. *Id.* She had thoughts of wanting to die by overdosing, but reported that she would not act on it because of her sons. *Id.* Her mental status examination showed that she was withdrawn, had normal thought content and perception, full affect, a depressed and anxious mood, and impairment of her memory, attention, ability to abstract and her orientation. *Id.* at 472. Plaintiff was diagnosed with panic disorder with agoraphobia, mood disorder not otherwise specified, and bipolar disorder by the LSW. *Id.* at 470. Her current global assessment of functioning score ("GAF") was 30, indicative of some impairment in reality testing or communication, or major impairment in several areas. *Id.*

After presentation to the LSW, Dr. Mercado then conducted a psychiatric examination of Plaintiff. He indicated that Plaintiff was alert, had normal orientation and memory, normal stream of thought and language, normal perception, good insight, fair judgment, no suicidal ideations, and an anxious mood. Tr. at 474-476. He diagnosed Plaintiff with Post-Traumatic Stress Disorder ("PTSD"), GAD, Obsessive Compulsive Disorder, ("OCD") and depression. *Id.* at 476. He rated Plaintiff's GAF at 52, indicative of moderate symptoms. *Id.*

On October 8, 2014, Plaintiff presented to Dr. Mercado for management of her anxiety and she reported that she slept better, but felt sad. Tr. at 478. He noted that her mood was anxious and

-5-

he wanted to rule out PTSD. *Id*. He indicated that her status was improving, he increased her Effexor, and he prescribed Remeron. *Id*.

On October 9, 2014, Plaintiff presented to Dr. Mercado for her increasing depression. Tr. at 479. He noted that Plaintiff's thought processes were normal, she had goal-directed associations, normal memory, and fair insight and judgment. *Id*. at 480. He noted that Plaintiff's mood was improving, he diagnosed Plaintiff with PTSD, and he increased her Effexor. *Id*. at 481.

On October 11, 2014, Dr. Mercado examined Plaintiff and found that her GAF was 55, and her status was improving. Tr. at 484. He noted that her mood and affect were improving, she was able to recall and focus, and her judgment and insight were improving. *Id.* at 483.

Discharge instructions from the Crisis Unit indicated that Plaintiff was discharged on October 11, 2014 with the medications of Prilosec, Loratadine, Effexor XR, Remeron, Klonopin, and Minipress. Tr. at 491-492. Her diagnoses were panic disorder with agoraphobia, mood disorder, rule out of bipolar disorder, PTSD, GAD, and OCD. *Id*. at 493. It was noted that her overall progress in treatment was improved. *Id.* Plaintiff denied any concerns and reported feeling "even keel" on her medications. *Id*. at 494.

On October 29, 2014, Dr. Foy conducted a psychiatric evaluation at Maumee Valley Guidance Center ("MVGC)". Tr. at 704. She observed that Plaintiff was bouncing her left leg up and down through the evaluation, her mood was nervous, her affect was broad, her speech was normal, her thought processes intact, and she had intact recent and immediate memories. *Id.* at 709. Dr. Foy noted that Plaintiff's recent memory was mildly impaired, her attention and concentration were grossly intact, and her insight and judgment were appropriate. *Id.* She diagnosed Plaintiff with bipolar I disorder, most current episode depressed, severe without psychotic features, GAD, panic disorder with agoraphobia, and PTSD of a chronic nature. *Id.* She rated Plaintiff's GAF at 55, indicative of moderate symptoms. *Id. at* 710. She continued Plaintiff on Lamictal with an increase in dosage after 5 days, decreased Effexor XR, continued Prazosin, Remerson, and Klonopin, and continued Plaintiff's counseling. *Id.*

On November 1, 2014, Plaintiff presented to the emergency room complaining of a headache for the past two days. Tr. at 505. She related her history of migraines, but stated that this one was

-6-

a bit worse than normal.  *Id.*  She denied blurry vision, chest pain or abdominal pain, but indicated nausea and vomiting.  *Id.*  She noted a recent increase in her Effexor.  *Id.*  Physical examination was normal and noted that Plaintiff was smiling and comfortable, but she had her face covered and the lights out.  *Id.*  Psychological examination indicated that Plaintiff was oriented and had normal affect, insight and memory.  *Id.* at 506.  A CT of the brain showed normal results, and Plaintiff was diagnosed with migraines and given a dose of Toradol, Phenergan and Benadryl.  *Id.*  Plaintiff reported that her migraine was much better after the medications.  *Id.*

Plaintiff continued to receive therapy from MVGC and continued to follow-up with Defiance Community Health Center.  Tr. at 499-502, 637-695.

On November 6, 2014, Plaintiff presented to Dr. Shamberg, Ph.D., a clinical psychologist, at the request of the agency.  Tr. at 512.  Dr. Shamberg noted that Plaintiff arrived on time and was guarded, frightened, and extremely depressed.  *Id.* at 513.  Plaintiff indicated that she last worked at Walmart and had to leave in mid-September 2014 because she was too anxious around all of the people in her position as a cashier.  *Id.* at 514.  She indicated that they would not give her another position, so she had to quit because she was too nervous and it caused her too much stress.  *Id.*

Plaintiff reported her admission to First Call for Help in 2014 and indicated that she was receiving outpatient therapy at MVGC with her psychiatrist, Dr. Foy, and with her counselor, Ms. Mallett.  Tr. at 514.  She indicated that Dr. Foy diagnosed her with PTSD, bipolar disorder, and agoraphobia, and she was currently prescribed Lamictal, Effexor XR, and Klonopin.  *Id.*  When asked about her daily living activities, Plaintiff reported that she did not perform many household chores because of her depression, but she washed dishes a lot and did laundry every week.  *Id.*  She indicated that she could not sleep well at night due to nightmares.  *Id.*  She stated that she did not go out much, she read on occasion and she had a computer at home.  *Id.*

Upon examination, Dr. Shamberg reported that Plaintiff appeared flat, severely depressed and frightened, but she was polite, deferential and cooperative.  Tr. at 514-515.  She avoided eye contact.  *Id.* at 515.  He found her pace of mentation to be "very, very slow," and he reported that she had normal thought processes, low-average cognitive functioning, and normal judgment and insight.  *Id.* at 515-516.  Dr. Shamberg performed no psychological testing as he indicated that none

was requested.  *Id*. at 516.  He diagnosed Plaintiff with bipolar I disorder, most recent episode depressed, currently very severe, PTSD, agoraphobia, panic disorder with diarrhea and nausea, social anxiety disorder, and unspecified anxiety disorder.  *Id*.

Dr. Shamberg opined that even if Plaintiff continued in therapy and treatment, her prognosis for improvements soon in mental condition was "very, very guarded."  Tr. at 516.  He further opined that Plaintiff would have "sever[sic], significant limitations" in understanding, remembering and carrying out instructions due to her low-average intelligence, mood swings, current deep depression, social fears and phobias, PTSD and panic attacks.  *Id.* at 517.  He further opined that Plaintiff would have significant limitations in paying attention, concentrating, and keeping up pace and persistence in order to perform simple or multi-step tasks.  *Id*.  Dr. Shamberg found that Plaintiff's low-average intelligence, her mood swings, current deep depression, and host of anxiety disorders would cause these limitations.  *Id*. at 517-518.  He further opined that Plaintiff would be severely, significantly limited in responding appropriately to supervision and coworkers in a work setting as she had a long history of leaving jobs because of the stress in working with people.  *Id*. at 518.  Finally, Dr. Shamberg opined that Plaintiff "would have very, very severe, significant limitations" in responding appropriately to work pressures as the pressure would come in the form of social contact.  *Id*.

Progress notes from MVGC dated throughout 2014 and 2015 show that Plaintiff continued to treat there for her mental health conditions.  Tr. at 524, 701-702.  Dr. Foy  met with Plaintiff on November 20, 2014 for medication management and noted Plaintiff's mood as depressed.  *Id*. at 711.  Mental status examination showed that Plaintiff had a depressed mood, broad affect, normal speech, intact thought processes, intact recent and remote memories, attention and concentration were grossly intact, and judgment and insight were appropriate.  *Id*. at 711.

On May 4, 2015, Plaintiff presented to the emergency room with chest pain and pressure over the past 2 days with shortness of breath and leg swelling.  Tr. at 561, 730.  She reported that she was sleeping better and through the night, but her concentration, energy and memory were low.  *Id*.  She reported no medication side effects.  *Id.*  Staff Psychiatrist Dr. Gray found that Plaintiff was alert and cooperative, with fidgeting and slight hand tremors, mildly decreased self-attitude, and an anxious affect.  *Id*. at 502.

On May 4, 2015, Plaintiff was admitted to the emergency room until May 5, 2015 due to complaints of chest pain after lifting heavy objects, and an echogram showed some diastolic dysfunction, mild atrial enlargement, and mild ventricular hypertrophy. Tr. at 543. Sleep apnea was also suspected. *Id.* She was diagnosed with chest pain, headache, nausea, vomiting, hypoxia, sleep apnea, hypertension, hyperlipidemia, bilateral lower extremity edema, gastroesophageal reflux disease, borderline diabetes, morbid obesity, bipolar disorder, depression dominant with anxiety, episodic dizziness, acute-on-chronic kidney disease, and tobacco abuse. *Id.* at 566-567. She was discharged on May 5, 2015 with home supplemental oxygen and medications, and a sleep study was recommended. *Id.* at 568. A June 2015 sleep study showed sleep apnea. *Id.* at 779. Plaintiff followed up with a cardiologist on June 9, 2015 and he indicated that Plaintiff was doing well from a cardiac standpoint and had good functional capacity, except she was still short of breath with exertion. *Id.* at 597. He also noted that Plaintiff's musculoskeletal chest pain was still reproducible with palpation. *Id.*

August 25, 2015 notes from a cardiologist indicate that Plaintiff follow up for her normal cardiac catherization from July 6, 2015. Tr. at 619. The cardiologist noted that Plaintiff had no chest pain or palpations, and no lower extremity edema, but she did have dyspnea on exertion and had positive arthalgias. *Id.* at 620. Physical examination was normal, but Plaintiff was diagnosed with severe hyperlipidemia and hypertriglyceridemia and elevated liver function tests. *Id.* at 621.

December 1, 2015 cardiologist treatment notes show that Plaintiff presented for a 3-month follow up and was doing well from a cardiac standpoint, although she still had shortness of breath, musculoskeletal chest pain reproducible with palpation, and dyspnea on exertion, which she thought was related to panic attacks. Tr. at 789. Her EKG and cardiac catherization were normal, but she had an abnormal stress test. *Id.*

**B.**    **Relevant Testimonial Evidence**

At the ALJ hearing, Plaintiff testified that she lived with her two adult sons and her ex-husband. Tr. at 45. She reported that she was born in 1966 and was 255 pounds at a height of 5'4". *Id.* at 45-46. She has a driver's license and drives to the grocery store, but does not drive often because of panic attacks when traffic is bad. *Id.* at 46. She completed three years of college

studying to be a LPN, but she did not get her degree as she was two classes away and could not sit through classes due to panic attacks.  *Id.* at 47.  She has had panic attacks since 2007. *Id.*

The ALJ asked Plaintiff why she was unable to work and Plaintiff responded that she experiences panic attacks when she leaves her house and they become more severe the more that she is around people.  Tr. at 53.  She testified that her depression also makes it hard for her to leave the house, and she has foot and hand problems, anxiety, and problems sitting and focusing.  *Id.*  She explained that she tore both of her Achilles tendons around 1988, so she cannot stand for more than 20 minutes and she can walk a couple of blocks.  *Id.*  Plaintiff reported that she elevates her feet 3-4 times per day for 20-30 minutes at a time.  *Id.* at 54.  She indicated that she has no issues with sitting, but she cannot lift and carry more than 10 pounds, and even with that, she tended to drop things and had trouble picking up small objects because of her right wrist, which was injured in 2001 and for which she had two surgeries and wears a brace.  *Id.* at 54-56.

Plaintiff related that her panic attacks have worsened since she started experiencing them in 2007 because they are more severe and happen more often.  Tr. at 56.  She indicates that if she is at home, she has panic attacks twice per week, but if she leaves the house, she has them constantly.  *Id.* at 57.  She explained that she takes medications, but the doctors are still working on the dosages to help control them.  *Id.* She indicated that she counts to herself in order to help*. Id.*  Plaintiff also reported that her depression makes her cry, makes her not want to get out of bed, and contributes to her not wanting to leave her house.  *Id.* at 58.  She has good and bad days, with bad days consisting of full-blown panic attacks or elevated anxiety where she paces, cannot sit still, and cannot concentrate.  *Id.*  With her depression on bad days, she cannot get out of bed.  *Id.*  She estimated that she has bad days on average 5 of 7 days per week.  *Id.*  She further testified that several times a day she has chest pressure, she feels that she cannot breathe, and she has a rapid heartbeat.  *Id.* at 66.

Plaintiff's medications were identified for the record and she reported that she has side effects of severe drowsiness, bladder incontinence and urgent diarrhea from them.  Tr. at 60.  Plaintiff also indicated that she has trouble with her memory and concentrating due to her medications.  *Id.* at 62.        Upon questioning from her attorney, Plaintiff indicated that she still

-10-

has migraines a couple of times per month where she cannot do anything because of the pain, nausea and vomiting associated with them. Tr. at 67-68.  She does not do many household chores, goes grocery shopping once per month, and she cannot cook because she drops too many things.  *Id*. at 68.  She testified that often, she showers only once per week and stays in her pajamas 5-6 days per week.  *Id*. at 69.          The ALJ then questioned the vocational expert ("VE").  Tr. at 69.  She asked the VE to consider a hypothetical person with the same age, education and past relevant work experience as Plaintiff with: the ability to lift, carry, push and pull up to 50 pounds occasionally and 25 pounds frequently; the ability to walk/stand and sit for up to 6 hours per 8-hour workday; never climb ladders, ropes and scaffolds; no exposure to unprotected heights or dangerous moving machinery or operating a motor vehicle; frequent exposure to dust, odors, fumes and pulmonary irritants; the ability to understand, remember and execute simple, routine, repetitive tasks, but not at a production rate pace such as assembly line work; the ability to understand, remember, and carry out simple work-related decisions; work changes should be well-explained and introduced slowly; frequent interaction with supervisors; and occasional interaction with co-workers and the public.  *Id*. at 71.  The VE testified that such a hypothetical individual could not perform Plaintiff's past relevant work, but she could  perform jobs existing in significant numbers in the national economy, including the jobs of packer, laundry worker, and stock handler.  *Id.* at 72.

The ALJ modified the hypothetical individual and added the occasional use of hand controls on the right, frequent handling, fingering and feeling on the right; occasional exposure to extreme cold; frequent use of foot controls on the right and left; superficial interaction with co-workers, meaning greeting people, referring co-workers to others regarding co-worker demands or requests, answering questions about the time of day, and giving directions to the bathroom.  Tr. at 72.  The ALJ indicated that superficial interaction would not involve the hypothetical individual dealing directly with the demands or problems of co-workers, and never interacting with the public.  *Id.*  The VE responded that this hypothetical individual would not be able to perform Plaintiff's past relevant work, but she could perform the jobs that she identified in the previous hypothetical.  *Id.* at 73.

-11-

The ALJ then changed the hypothetical individual to only occasional handling, fingering and feeling on the right when the right hand is dominant. Tr. at 73. The VE responded that there would be no jobs available at the medium exertional level for such an individual. *Id.*

The ALJ then modified her first hypothetical individual to change the exertional level to light jobs. Tr. at 73. The VE testified that this hypothetical individual could perform jobs existing in significant numbers in the national economy, such as the light jobs of inspector, housekeeper, or a stock clerk. *Id*. at 73-74.

In her fourth hypothetical individual, the ALJ modified her third hypothetical individual and limited her to occasional use of hand controls on the right, frequently handling, fingering and feeling on the right, and superficially interacting with co-workers and never interacting with the public. Tr. at 74. The VE testified that the light jobs that she previously testified about would be available for such a person. *Id*.

The ALJ asked if the same jobs would remain if she modified the fourth hypothetical individual by changing frequently handling, fingering and feeling on the dominant right hand. Tr. at 74. The VE testified that the prior jobs would not be available. *Id*. The VE also testified that no jobs would be available if the hypothetical individual was off-task 20% or more of the workday on a continuous basis. *Id*. She explained that employers would expect an employee to be on-task at least 85% of the time and would tolerate only 1 absence per month after the probationary period. *Id.* at 74-75.

**III.     SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In her May 4, 2016 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 11, 2014, her amended alleged onset date, and she found that since that date, Plaintiff had the severe impairments of: mood disorder; PTSD; GAD; OCD; depressive disorder; bipolar disorder; panic disorder with agoraphobia; obesity; obstructive sleep apnea; status post arthroscopic repair of fibrocartilage tear and excision of ganglion, right wrist; and history of carpal bone instability. Tr. at 22. The ALJ further found that beginning on May 5, 2015, Plaintiff had the severe impairments of: mood disorder; PTSD; GAD; OCD; depressive disorder; bipolar disorder; panic disorder with agoraphobia; obesity; obstructive sleep apnea; status post arthroscopic

-12-

repair of fibrocartilage tear and excision of ganglion, right wrist; history of carpal bone instability; and grade II diastolic dysfunction. *Id.*

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. Tr. at 23. After considering the record, the ALJ found that prior to May 5, 2015, Plaintiff had the RFC to perform medium work with the following limitations: standing, walking and sitting up to 6 hours per 8-hour workday; lifting, carrying, pushing and pulling up to 50 pounds occasionally and 25 pounds frequently; never climbing ladders, ropes or scaffolds; no exposure to unprotected heights, dangerous moving mechanical parts, or operating a motor vehicle; frequent exposure to dust, odors, fumes, and pulmonary irritants; occasionally using hand controls on the right dominant hand; frequent handling, fingering and feeling with the right hand; occasional exposure to extreme cold; frequent use of foot controls on the right and left; understanding, remembering and carrying out simple, routine, and repetitive tasks but not at a production rate pace, such as assembly line work; understanding, remembering and carrying out simple work-related decisions; work changes should be well explained and introduced slowly; frequent interaction with supervisors; superficial interaction with co-workers, and by superficial, the ALJ meant the ability to greet people, refer co-workers regarding co-workers' demands or requests, answer questions about the time of day and give directions to the bathroom; superficial interaction would not involve claimant dealing directly with demands or problems of the co-worker; and the claimant should never interact with the public. *Id*. at 26.

The ALJ further determined that beginning on May 5, 2015, Plaintiff had the RFC to perform light work with the same limitations that she identified prior in her RFC prior to May 5, 2015. Tr. at 28. She explained that the medical evidence showed that in May of 2015, Plaintiff had a new impairment of grade II diastolic dysfunction, which supported a light work limitation. *Id.*

Based upon Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ determined that prior to May 5, 2015, Plaintiff could not perform her past relevant work, but she could perform jobs existing in significant numbers in the national economy, such as packer, laundry worker and stock handler. Tr. at 33. She further found that beginning in May of 2015,

-13-

Plaintiff could not perform her past relevant work but she could perform jobs existing in significant numbers in the national economy, such as inspector, housekeeper and stock clerk. *Id.* In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and she was not entitled to SSI from July 11, 2014, through the date of her decision. *Id.* at 34.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see   20 C.F.R.   § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

-14-

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.  LAW AND ANALYSIS

The undersigned takes Plaintiff's claims of error out of the order in which they are presented.

### A.  STEP TWO NON-SEVERE IMPAIRMENTS

Although she does not spend much time on this issue, Plaintiff asserts that the ALJ erred by failing to find that several of her impairments were severe. ECF Dkt. #13 at 19. In particular, Plaintiff contends that the medical record supports a finding that her epicondylitis, migraines, and urinary incontinence provide more than minimal limitations and the ALJ erred by finding these impairments non-severe. *Id*. at 19-20.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a).

At step two, the term "significantly" is liberally construed in favor of the claimant. The

-15-

regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d).  The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims."  *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).  Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987).  Once a claimant clears Step Two of the sequential analysis, the ALJ is required to consider all of his or her impairments, severe and non-severe, at every subsequent step of the sequential evaluation process. *See Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008)(ALJ's failure to identify an impairment as severe was "legally irrelevant" because the ALJ found other impairments to be severe at Step Two, which allowed the ALJ to consider all impairments in the later steps in the process).

In asserting that her epicondylitis, migraines, and urinary incontinence are severe impairments in this case, Plaintiff cites to her testimony before the ALJ that she drops objects and has trouble picking up small items due to her wrist injury and finger numbness.  ECF Dkt. #13 at 20, citing Tr. at 56.  She further cites to her testimony concerning the severe migraines that she suffers a couple of times per month that are accompanied by nausea and vomiting.  ECF Dkt. #13 at 20, citing Tr. at 67.  She also cites to medical evidence showing at least two emergency room trips for migraine treatment.  ECF Dkt. #13 at 20, citing Tr. at 368, 505.

The undersigned notes that the ALJ reviewed these alleged severe impairments at Step Two. Tr. at 23.  She identified each of them, among other alleged impairments, and concluded that they

were not severe or not medically determinable "as they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to result in more than minimum work-related restriction for a continuous period of at least 12 months, are not expected to result in death, and/or have not been properly diagnosed by an acceptable medical source..." *Id.* The ALJ thereafter cited to a host of medical records which she found showed that there "were no significant objective medical findings in the record to support more than minimal limitations" on Plaintiff's ability to perform work activities relating to her epicondylitis, migraines, and urinary incontinence, and other alleged impairments. *Id.*

The undersigned recommends that the Court find that substantial evidence supports the ALJ's Step Two determination as to the non-severity of Plaintiff's epicondylitis, migraines, and urinary incontinence. While Plaintiff testified about the severity and limitations from these conditions, the ALJ did not find her testimony fully credible. Tr. at 26-27. In support of the discounting of Plaintiff's credibility and her Step Two non-severity finding, the ALJ cited to medical records indicating that Plaintiff had right wrist surgery many years before her onset date, but she returned to work after the surgery and she told her surgeon that she was "mostly better" and "happy with her progress" after the surgery. Tr. at 23, citing Tr. at 301, 312. The ALJ also cited to medical records showing that Plaintiff denied musculoskeletal complaints at numerous examinations, and physical examinations finding that she had normal right upper extremity strength and motor function. Tr. at 23, 27, citing Tr. at 449-450, 540-542, 561-562, 625, 677-678, 787-789.

As to her migraines, the ALJ cited to the two emergency room visits that Plaintiff made due to migraines, one of which occurred before her alleged onset date, and the reports that the migraines resolved with medication at the emergency room. Tr. at 505-506, 740, 757, 777. Part of the medical record cited by the ALJ also showed normal results from a head CT scan taken due to Plaintiff's headaches. *Id.* at 509. The ALJ also cited to treatment records showing that Plaintiff denied having headaches on many occasions, which discounted her testimony assertions of frequent, severe migraines. *Id.* at 23, citing Tr. at 629, 645, 657, 661, 667-668, 673-675, 677-678, 687-688.

With regard to her urinary incontinence, the ALJ noted Plaintiff's testimony that she had bladder incontinence a couple of times per day. Tr. at 27, citing Tr. at 61. The ALJ cited to the

January 2015 medical records where Plaintiff reported having bladder incontinence after Dr. Foy increased her medications. *Id.* at 23, citing Tr. at 659-665. Plaintiff was given medication for urinary incontinence, which was noted by the ALJ. *Id.* at 668. However, the ALJ cited to the February 18, 2015 treatment notes of Dr. Foy in which Plaintiff reported that she was not taking the medication prescribed for urinary incontinence, but she was doing kegels and wearing a brief at night. *Id.* at 23, citing Tr. at 670-671. She declined another prescription offered for incontinence. *Id.* at 23, citing Tr. at 675. The ALJ further cited to numerous instances where Plaintiff denied urinary incontinence issues, which negated her testimony concerning its frequency. *Id.* at 23, citing Tr. at 453-454, 527, 620-621, 629-630, 666-668, 672-675, 677-678, 705. The ALJ also cited to treatment notes dated April 3, 2015 in which Dr. Foy decreased Plaintiff's medications and treatment notes thereafter showed that Plaintiff again denied urinary urgency, frequency, dysuria, or nocturia. *Id.* at 23, citing Tr. at 677-678. The ALJ additionally cited to additional records where Plaintiff did not complain of urinary issues in May and June of 2015. *Id.* at 23, citing Tr. at 684-685, 690-691. Based upon the ALJ's identification of Plaintiff's epicondylitis, migraines, and urinary incontinence at Step Two, her discussion of these impairments, and her citations to numerous medical records supporting her determination that these impairments were not severe, the undersigned recommends that the Court find that substantial evidence supports the ALJ's Step Two findings that these impairments were not severe.

The undersigned alternatively points out that the Court can choose to decline to address whether the ALJ erred in failing to find that these impairments were not severe because she determined that many of Plaintiff's other impairments were severe and she continued on in the disability evaluation process. In *Maziarz*, the Sixth Circuit Court of Appeals held that an ALJ's failure to find one of a claimant's impairments to be severe was not reversible error because the ALJ considered other impairments to be severe and continued onward in the disability evaluation process, where the severe and non-severe impairments could be considered in the remaining steps of the process. 837 F.2d at 244. Similarly here, the ALJ found that since July 11, 2014, Plaintiff's mood disorder, PTSD, GAD, OBD, depressive disorder, bipolar disorder, panic disorder with agoraphobia, obesity, status post arthroscopic repair of fibrocartilage tear, excision of ganglion cyst on the right

-18-

wrist, and history of carpal bone instability.  Tr. at 22.  Beginning on May 5, 2015, the ALJ found all of the above impairments to be severe, and added the impairments of obstructive sleep apnea and grade II diastolic dysfunction as severe.  *Id.*  The ALJ went onward in the disability evaluation process and considered Plaintiff's epicondylitis, migraines, and urinary incontinence in those remaining steps.  *Id.* at 26-29 (setting forth Plaintiff's RFCs with limitations on using hand controls with the right hand, limiting Plaintiff's mental RFC, and referencing medical records and Plaintiff's testimony concerning these impairments).

Accordingly, since the ALJ could and did in fact consider Plaintiff's epicondylitis, migraines, and urinary incontinence in determining whether Plaintiff had the RFC to allow her to perform substantial gainful activities, the undersigned alternatively recommends that the Court find that ALJ's failure to deem these impairments severe at Step Two does not constitute reversible error. *Maziarz*, 837 F.3d at 244; Tr. at 26-30.

## B.  MEDICAL OPINION, RFC AND MEDICATION SIDE EFFECTS

Plaintiff also asserts that substantial evidence does not support the ALJ's RFC findings for her because the ALJ failed to properly evaluate the opinion of Dr. Shamberg and failed to consider the side effects from her medications.  ECF Dkt. #13 at 15-19.  For the following reasons, the undersigned recommends that the Court find that the ALJ's determination as to the little weight that she attributed to Dr. Shamberg's opinion is supported by substantial evidence and the ALJ properly considered Plaintiff's medication side effects and had substantial evidence to support limitations from those effects that she found credible and supported by the evidence and those that she did not.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [her] limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3).  The claimant bears the responsibility of providing the evidence used to make a RFC finding.  20 C.F.R. §§ 416.945(a)(3).  However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.  Social Security Ruling ("SSR") 96-8p provides guidance on

assessing RFC in social security cases.  SSR 96-8p.  The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis.  *Id*.  Further, it states that the RFC assessment must be based on *all* of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations.  *Id*.

Opinions from agency medical sources are considered opinion evidence. 20 C.F.R. § 416.927(f). The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii).  More weight is generally attributed to examining medical source opinions than on non-examining medical source opinions. *See* 20 C.F.R. § 416.927(d)(1). However, an ALJ can attribute significant weight to the opinions of a non-examining state agency medical expert in some circumstances because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. However, the Sixth Circuit has held that the social security regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one examining physician's opinion over another. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006).

Moreover, while an ALJ is not required to discuss each and every piece of evidence in the record to justify his or her determination, *see, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004), when the opinion of a medical source contradicts the ALJ's limitations in the claimant's RFC, the ALJ "'must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.'" *Wolfe v. Colvin*, No. 4:15CV1819, 2016 WL 2736179,

quoting *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, the ALJ indicated in her decision that she considered the opinions of Dr. Shamberg, the agency examining psychologist.  Tr. at 30.  She cited to his prognosis for improvements in Plaintiff's mental condition as "very, very guarded," and she noted his significant limitations for Plaintiff in the areas of attention, concentration, pace and persistence, and in responding appropriately to supervisors and coworkers.  *Id*. at 30, citing Tr. at 512-518.  She also quoted Dr. Shamberg's opinion that Plaintiff would have "'very, very severe, significant limitations" in responding to most work pressures.  *Id*. at 30, citing Tr. at 518.  The ALJ afforded Dr. Shamberg's opinions only "little weight," finding that they were inconsistent with the overall evidence of record, including treatment notes indicating that she was often alert and oriented, she was cooperative and maintained eye contact, she showed a normal mood and affect, and she exhibited normal concentration and attention during mental status examinations.  *Id*. at 31.

While Plaintiff points to numerous citations in the medical records concerning her mental health conditions as supporting an opposition conclusion, the standard of review for this Court is whether the ALJ applied the proper legal standards and whether substantial evidence supports the ALJ's decision to attribute little weight to Dr. Shamberg's opinions, even if substantial evidence exists to support a contrary conclusion. ECF Dkt. #s 13-1, 13-2.

In attributing little weight to Dr. Shamberg's opinions, the ALJ reasoned that they were inconsistent with the overall record.  Tr. at 31.  She cited to numerous records which showed that, *inter alia*, Plaintiff maintained good eye contact, had a normal mood and affect, and showed normal concentration and attention during mental status examinations.  Tr. at 31, citing Tr. at 448-451, 455-456, 460, 475, 502, 625-626, 631, 652, 662, 667, 673, 679, 687, 693.

Plaintiff attacks the ALJ's medical record citations, asserting that some of them are presented as "neurological" findings rather than "psychiatric" findings, and some of these findings came from those not specialists in the mental health field.  ECF Dkt. #13 at 16.  The undersigned agrees with

Defendant that the issue of whether the findings of the examinations were labeled "neurological" or "psychiatric" in the treatment notes is of little relevance when the findings under both of these labels addressed Plaintiff's mental health conditions and the specific limitations that Dr. Shamberg opined were so significantly limited. For example, as cited by the ALJ, when Plaintiff presented to CNP Askins for follow up for her anxiety and depression medications, CNP Askins noted under "Neurologic" findings that Plaintiff was grossly oriented, had normal speech, an intact memory which included both immediate recall and long-term recall, and she had normal attention and concentration abilities. Tr. at 625. Under the "Psychiatric" findings, CNP Askins further found that Plaintiff's judgment and insight were intact, her mood was depressed, and her affect was appropriate. *Id*. at 626. Plaintiff does not explain and the undersigned fails to see how the label of "Neurologic" as opposed to "Psychiatric" negatively impacts these findings.

In addition, while Plaintiff contends that some of the findings relied upon by the ALJ concerned findings made by providers other than mental health specialists, Defendant properly points out that the author of the findings about whom Plaintiff complains, CNP Askins, is the very provider who was treating Plaintiff's mental health conditions of anxiety and depression, and medication management for these conditions as well as her gynecologic and other conditions. See Tr. at 216-217, 448, 451, 453-457, 458-461, 625-626. CNP Askins had treated Plaintiff multiple times over the course of a year. *Id*. at 448-451, 453-457, 458-461, 625-626, 637-695. Accordingly, she had a better understanding of Plaintiff's conditions as opposed to a one-time examiner such as Dr. Shamberg.

Plaintiff further asserts that the ALJ ignored much of the record evidence concerning her mental health conditions and she attaches to her brief a list of references in the medical records that the ALJ allegedly ignored which supported Dr. Shamberg's opinions. ECF Dkt. #13-2. However, the ALJ was not required to review every piece of evidence in her decision. In addition, many of the findings that Plaintiff alleges that the ALJ ignored were actually made by the ALJ. For instance, Plaintiff points to records indicating her mood as depressed and anxious, having avoidant eye contact, and a flattened affect. *Id*. However, the ALJ noted that she afforded the state reviewing psychologists' opinions only partial weight because their assessed social interaction limitations were

-22-

somewhat inconsistent with other record evidence that she cited showing that Plaintiff sometimes had avoidant eye contact and a depressed and anxious mood.  Tr. at 30, citing Tr. at 450, 472, 515.  The ALJ even cited to Dr. Shamberg's own findings upon examination as to Plaintiff's avoidant eye contact and depressed and anxious mood.  Tr. at 30, citing Tr. at 514-515.  She also noted that Plaintiff had a long history of depression and anxiety which started in her childhood with increasing symptoms in 2007.  Tr. at 27.  The ALJ cited to other records indicating that Plaintiff sometimes presented with a depressed and/or anxious mood, and she presented to crisis care for medication stabilization with avoidant eye contact, unkempt appearance, racing thoughts, and a depressed and anxious mood.  *Id*. at 28, citing Tr. at 467-472.  The ALJ further cited to Plaintiff's six-day stay for medication stabilization and Plaintiff's report upon discharge that she felt "even keel" on her medications.  Tr. at 28, citing Tr. at 493.  She also cited to numerous instances in the record thereafter where Plaintiff presented as alert, cooperative, and oriented, with a normal mood and affect.  Tr. at 28, citing Tr. at 475, 502, 652, 662, 667, 673, 679, 687, 693.  The ALJ also relied upon the mental status examinations of psychiatrists at First Call for Help, including those of Drs. Mercado and Foy.  Tr. at 25, citing Tr. at 475-476, 480, 483, 709, 711.  Dr. Mercado indicated that Plaintiff's status was improving with an increase in Effexor and Dr. Foy found that Plaintiff's attention and concentration were grossly intact, her insight and judgment were appropriate, her immediate and remote memories were intact, and her recent memory was mildly impaired.  *Id*. at 481, 709.

Moreover, the ALJ did provide limitations based upon Plaintiff's mental health conditions, as she limited Plaintiff to jobs that: have tasks that are simple, routine and repetitive; do not have a production rate pace; involve understanding, remembering and executing simple work-related decisions; have changes that are well-explained and are introduced slowly; have frequent interactions with supervisors and only superficial interactions with coworkers, such as greeting people, referring coworkers to other coworkers concerning demands or requests and answering questions about the time of day or directions to the bathrooms and not dealing directly with demands or problems of coworkers; and never interacting with the public.  Tr. at 26, 28.

-23-

For these reasons, the undersigned recommends that the Court find that the ALJ provided a sufficient explanation for her decision to attribute little weight to Dr. Shamberg's opinions and substantial evidence supports that determination.

Plaintiff further complains that the ALJ failed to specifically consider the side effects from her medications, such as her severe drowsiness, bladder incontinence a couple times per day, and urgent diarrhea. ECF Dkt. #13 at 19. The undersigned recommends that the Court find that the ALJ did consider these side effects as the ALJ specifically noted in her decision that Plaintiff reported the adverse side effects of severe drowsiness, bladder incontinence and urgent diarrhea from her medications. Tr. at 29. The ALJ indicated in her decision that she considered these side effects, she accounted for them, and her RFCs for Plaintiff were consistent with them. *Id*. The undersigned further recommends that the Court find that substantial evidence supports the ALJ's RFC limitations for Plaintiff's severe drowsiness, and her failure to provide specific limitations for Plaintiff's alleged urinary incontinence and urgent diarrhea.

The ALJ's RFC adequately accounted for Plaintiff's drowsiness, to the extent that the ALJ found it credible, as the mental RFC limited Plaintiff to: simple, routine, repetitive tasks not at a production rate pace; understanding, remembering and executing only simple, work-related decisions. Tr. at 26-29. The ALJ also determined that Plaintiff could have no exposure to unprotected heights, dangerous moving mechanical parts, or operating a motor vehicle, and never climbing ladders, ropes and scaffolds. *Id*.

As to Plaintiff's testimony concerning urinary incontinence, the ALJ specifically indicated that she considered this medication side effect. Tr. at 27, 29. However, Plaintiff is correct that the ALJ's RFCs did not include any limitation resulting from it. The ALJ did discuss Plaintiff's testimony about urinary incontinence as a side effect of her medication, but she found at Step Two of her sequential evaluation that it was not a severe impairment as it did not impose more than minimal limitations on Plaintiff's ability to perform work activities. Tr. at 23. Accordingly, the ALJ's failure to include limitations for this side effect is adequately supported.

As to Plaintiff's testimony concerning urgent diarrhea, the ALJ indicated that she also considered Plaintiff's testimony concerning this side effect, but her decision does not appear to

-24-

include any RFC limitations relating to it and she does not mention it in the rest of her decision.  Tr. at 29.  Whether the ALJ failed to include this alleged side effect in her RFC because she found it to be unsupported or whether she negligently failed to include this side effect in her RFC, the undersigned recommends that the Court find that it is harmless error. Plaintiff points to no medical evidence establishing urgent diarrhea as an ongoing medication side effect that requires a limitation in her RFC and the medical evidence appears to show the contrary, as many of the records, some which the ALJ cited in her Step Two evaluation, indicate that Plaintiff denied having diarrhea to her medical providers.  Tr. at 23, citing Tr. at 687, 733; *see also* Tr. at 315, 330, 446, 449, 454, 561, 624, 630, 639, 645, 651, 661, 667, 673, 678, 693, 760.

For these reasons, the undersigned recommends that the Court find that the ALJ adequately considered Plaintiff's alleged medication side effects of severe drowsiness, urinary incontinence and urgent diarrhea, and substantial evidence supports her RFC limitations as to Plaintiff's severe drowsiness, and her lack of RFC limitations for Plaintiff's urinary incontinence and urgent diarrhea.

### C. OFF-TASK AND ABSENCES FROM WORK

Plaintiff also asserts that the ALJ erred when she failed to find that Plaintiff could not sustain competitive employment because the VE testified that an individual had to be on-task 85% of the workday to sustain such employment and she could not miss more than one day per month of work.  ECF Dkt. #13 at 13-14.  Plaintiff contends that the ALJ disregarded the VE's testimony concerning these areas and failed to address these issues in her decision.  *Id*. at 13.  Plaintiff concludes that "[g]iven Ms. Theis' testimony, which is supported by the evidence in the file, the ALJ's failure to address these critical  issues is reversible legal error."  *Id*.(citations omitted).

Again, the standard of review is whether the ALJ applied the proper legal standards and whether her decision is supported by substantial evidence.  The VE testified as to a employer's customary requirement of being on-task 85% of the workday and employer tolerance of only 1 absence per month.  Tr. at 74-75.  However, the VE was not testifying as to whether Plaintiff was able to be on-task 85% of a workday or whether she would be absent more than 1 day per month, as she was the VE and not a medical expert.  And while the ALJ inquired into these two areas, it was her decision not to include them in her hypothetical individuals to the VE and to not apply them in

-25-

her RFCs based upon the evidence before her.  While Plaintiff relies upon her own testimony concerning good days and bad days and her limitations on bad days, the ALJ indicated in her decision that she discounted Plaintiff's testimony concerning her severe limitations.  Tr. at 27.  The ALJ discounted Plaintiff's credibility based upon the medical evidence finding to the contrary, as explained above.  Moreover, while the ALJ did not directly address Plaintiff's abilities to be on-task and her absences from work on a sustained basis, she did address these issues indirectly in that she gave partial weight to the opinions of the state reviewing psychologists, who, *inter alia*, opined that Plaintiff was not significantly limited in her abilities to perform activities within a schedule, and to maintain regular attendance and punctuality within customary tolerances.  Tr. at 30, citing Tr. at 86, 102. Further, while Dr. Shamberg's opinions addressed Plaintiff's limitations in understanding, remembering and carrying out instructions, and in maintaining concentration and attention and persisting with tasks, they did not specifically address Plaintiff's abilities to be on-task or her ability to attend work and the ALJ provided limitations in her mental RFCs for Plaintiff as to the areas addressed by Dr. Shamberg, to the extent she found them supported by the evidence.  The ALJ is required to include only those limitations that she finds credible and supported by the evidence in her RFC.  *See Poe v. Comm'r of Soc. Sec*., 342 Fed. App;x 149, 155-156 (6th Cir. 2009).

For these reasons, the ALJ was not required to include the specific limitations of being off-task and absent from work in her RFCs for Plaintiff and her failure to specifically address these issues is not reversible error.  It is the ALJ who ultimately determines a claimant's RFC, not a physician.  20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.

## VII.   CONCLUSION AND RECOMMENDATION

For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: July 31, 2018                              */s/George J. Limbert*
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).